Kept our guests waiting, we'll call the matter for argument, Josh Finkelman v. The NFL, now. Mr. Nagel? Yes, sir. I, too, join in the panel's congratulations to all of the new admittees. NYU class of 77, Brian, a long time ago. So congratulations to all. Deja vu all over again, Mr. Nagel. Believe it or not, that's exactly how I intended to start, that my task today is to convince your honors that this is not deja vu all over again. And I'm going to start, if I can, with footnote 97 in the opinion, tie it, if I can, to the language at page 200 of the opinion. And understand that footnote 97 was really the road map that your honors outlined for me of my first time around back in October of 2015 when I argued this for the first time. And in footnote 97, you make clear that in its current posture, the case does not require us to consider the correct result if plaintiff's counsel, myself, had included allegations about his proffered expert in the complaint itself. And in the body of the opinion, specifically pages 200 and 201, you expressed concern that whether or not the restriction on ticket sales, whether or not the NFL's procedures here in any way resulted in increased price or restriction in the marketplace. And you were concerned that it was speculation, potentially, that we didn't really know whether or not the prices were increased, decreased, or remained the same. And you, in effect, were calling for more of an expert support. You cited in the first opinion only one economic piece of literature that, if you walk through it, did not really support the theory that we had alleged. So the road map was set forth. And interestingly, you granted leave to replead in the discretion of the district court. And we went back there, back to the district court, and we outlined with our new expert, and I want to spend a minute talking about why those allegations, both facts and opinions, are so critical to this argument. Went back there, and the NFL argued when I moved for leave to amend based upon the second model. You'll recall you went through two models of opinion. Model number one, which was the difference between the face value of the ticket and that which you paid. And your honors reasoned that because he did not partake in the lottery, there could be no Article III standing. But your honors left open the second model. And your honors did not close the door based upon the lottery argument that the NFL raised below. They raised on the first appeal. And critically, they raised when I moved for leave to appeal. They said, and the transcript is for your honors. They said, you cannot have Article III standing because, once again, Finkelman did not partake in the lottery. And I argued, no. The Third Circuit did not close the door. They remanded for leave to replead, and that was granted. So the district judge rejected the argument, once again, that model number two is dead because Finkelman failed to partake in the lottery. Is there any connection between that entering the lottery and your second theory of liability? Zero. I didn't mean to jump on your honor. Zero. And the reason is because the theory, the economic theory that we've pled. Excuse me. Is this the theory that was presented to the district court by the NFL, or is this a holding that the court came upon without argument from counsel? Your honors granted leave to replead in the discretion of the district court. When I made that application, I included my amended complaint. In the amended complaint that your honors have here in the appendix, I believe it's joint appendix 308. Actually, 308 to 317 is the critical language of the Dr. Rauscher report. But we included that language, and when we submitted our revised pleading, the district court granted leave over the objection of the NFL who said, Wait a second. It doesn't matter what you replead. Because he did not partake in the lottery, you cannot, as a matter of law, satisfy Article 3 standing. That was rejected initially when we repled, and we were granted leave to do so. Let me focus on why this pleading is different than the last pleading. Obviously, a cursory retells you that this is really chock full of nuts. What I've done here, without discovery, and I don't think I've seen a single case in this district that has ever pled an expert series of opinions as intricately as I've done here. And I did it because I took your honors leave as to what the road map should be to cure what you consider to be the Article 3 defect in our first pleading. And I engage probably the leading sports economist in the world, Dr. Rauscher, Ph.D. out of Berkeley. And Dr. Rauscher gave you his opinions in this report. Is there anything other than his opinions? Are there any new facts that support your theory? Yes, there are. You will notice in the amended complaint that Dr. Rauscher substantially bases his opinion on the restriction in the sellers, that is the concentration of the brokers. And you will see at paragraphs 18 and 19 the following new facts. You will see that we have pled that in paragraph 19, we pled that Prime Sports partnered with 14 of the NFL 32 teams, including the NFL champions Seattle Seahawks and Coastal New York Jets, providing them access to 34.4% of all Super Bowl tickets. You will also see that we pled that in addition to that, Ace Ticket, again in page 19, Ace Ticket is another mega broker dealing in large volumes. Now those are facts that support his ultimate conclusion, which stands on four separate prongs. His ultimate conclusion that the restriction in the brokers or the amount of sellers in the secondary market... Basically a supply and demand argument? Well, he basically fleshes out the supply and demand argument that this panel felt was a little bit too amorphous just saying supply and demand, which is the way we pled it the first time. This is the most intricate set of conclusions, analysis and opinions. And Judge Stark, 49 separate annotations to these opinions on the complaint, 49. This is one of the most intricate expert reports in literally 40 years of law practice I've ever seen. But if we look at that and conclude it's all just opinions of an expert and it's not new facts, then have you followed the guidance that the court gave you in footnote 97? The answer is I have. And the reason I have is because there's law around the country, specifically in the Eighth Circuit and the Green Tree case, which suggests that we're not challenging the bona fides of expert opinions on a motion to dismiss at this level. We're not challenging that. I cannot give you every single fact now without a scrap of discovery. It is as if I'm arguing this case after I got a verdict and I'm arguing for a motion to vacate. The reality is I'm working on what I can do. And the Article 3 standing requirements really, really are quite liberal throughout the country. And we only need to pass a constitutional muster. Does it feel, does it smell like a case of controversy? I don't have to prove my case at this level. That's what the law says. And the fact that I've included the opinions and the facts are more than sufficient to suggest to this panel that there is a bona fide economic theory from a Ph.D. in sports economy and economics, who has a subspecialty in ticket sales, who has written, who has studied these very issues, restrictive ticket sales, scalping, markups in the secondary market. This is exactly the expert who anybody would engage to say, tell us if there's any effect on the secondary market. And his conclusion there is, I quite frankly, Judge Starr, don't know what else without discovery that any plaintiff could possibly do. Could you address the NFL's argument that they did not withhold those tickets from the public? I certainly will. And that appears to be part of the district court's decision as well. I will. And Judge Fuentes, if I can, I think I need to put some context in it before I answer your question. I have really a very unusual procedural situation going on here. Your Honors decided in early 2016 that we lacked Article III standing and therefore the analysis and opinions of the district court were really null and void because the district court had no jurisdiction. Knowing that, knowing that, the district court, second time around, concludes that there's no Article III standing because we didn't partake in the lottery. Now, that was the end of the inquiry. The district court did not, on the Article III analysis, make any reference at all to the fact that the tickets were on hold. The district court, despite the fact that it knew it lacked jurisdiction to address the merits. Can I get you back to that question? Because you're out of time and money. Oh, yes, I'm sorry. But all of these tickets, and I would imagine there were somewhere in the neighborhood of 75,000 to 80,000 tickets. That's exactly right. About 80,000 tickets, yeah. All of these, the vast majority of all those tickets, if not all of them, were distributed before they were offered to the public. They were held back, yeah. Okay, they were held back. Held back, exactly. So there was nothing to offer to the public. So there's no violation. So goes the argument of the NFL. There was no violation of the statute. And I'll answer it this way. If the NFL had held back all of the tickets and not sold any, there would be no violation. And I told you that in the colloquy, I believe, of the first argument. But the problem is they sold 1,000 to the public. Those are the ones that are offered. Yeah, they sold 1,000. Now, they never argued in both of the appeals and all the arguments below, they never argued that this is a de minimis violation of the Consumer Fraud Act. And, of course, they can't because it's a remedial statute that is the most protective in the country. And, quite frankly, there's no other in the country that gives the public this protection. Nor is there any other state in the country, no other jurisdiction, where there's been commissions and studies and reports that went on for years about why it was the public was being deprived of access to, one, good pricing, and two, good seats. And the way it was solved is our legislators said, wait a second, if you're going to hold an event in New Jersey, whatever it may be, you need to sell 95% or more to the public. That's what our legislators said. And that is the simplest, plain reading at all. You cannot read the statute. You can't look at any of the brokers, any of the legislative history. They sold. When they sold one ticket, they violated. They did offer the tickets to the public. Yes. Did they violate? They did. They offered 1,000 tickets to the public. That's a violation. The statute says they cannot withhold more than 95. They did. They withhold by their own admissions. The beauty of this case is the NFL has admitted that they withheld 99% of the tickets. But those 99% were never intended for the general public. Okay. And let's talk about that. Let's talk about that. Because if that's the view of the statute, then the statute is meaningless. Because the reason why the statute was passed is to prevent promoters and insiders from holding it back. Wait a minute. Why get to the reason when the language itself of the statute doesn't include any language of intent? Isn't that the answer? I agree with you. I agree with Judge Smith. And we argued this twice below. You can't read into the statute language which says that the promoter intended to sell. That's not part of it. Look, the evil that the statute was there to cure was this very evil. If you hold an event, you've got to release 95% of the tickets. You can't reserve for the promoter the right to say, by the way, I'm going to have my own contractual deals with my teams, and I'm going to reserve 99% for us and release one. If that is the case, how do you determine which are the tickets whose release for sale to the general public was withheld? And how do you determine what all available seating was? It's easy. How? It's very easy. We know for a fact that Giants Stadium held about 80,000 to 90,000 people. We know for a fact because they never disputed it. It's in all of their papers. We withheld 99% of the tickets, 75% to the teams, 25% to the players. We pled it. It's factual record. It's never been disputed. It's clear in this case the NFL decided they only want 1% of the public to have access to tickets. I'm sorry, 1% of the tickets. Excuse me. It's clear that the NFL only permitted the public to purchase through the lottery 1% of the tickets, about 900 to 1,000 tickets. Now, this is, on its face, basically a screaming violation. May I ask you about this before? I know your time is up, but the statute says withhold those tickets from sale to the general public. Yes. They did not. They didn't do it. They didn't do it, and the NFL admits it. They gave 75% to the teams. They gave another 20-some-odd percent to the hosts. The answer is they didn't give it for sale to the public. They allocated this, and our pleading, which we redid based upon your Honor's guidelines, we pled that those tickets that were allocated to the teams, that 75%, were then given to the two lead brokers. We pled that, Judge Stark. When you said, what are the facts? We pled that, that those tickets, 75%, allocated to the teams. The large majority were then sold to the mega brokers who controlled the marketplace and increased the price in the secondary market. So to that extent, we have satisfied each of the three Article III requirements. I know we've gone past your time, but if you could answer that. The NFL says, well, if you're right about this theory of what the statute means, then there's a lot of practices that are going on that evidently would also be unlawful. A university wants to withhold a certain amount of tickets to give to its alumni base, even though they're selling, let's say, 80% of the tickets made to a Rutgers game, for instance. Isn't that illegal on this very same theory? The answer is, in New Jersey, it is. And that is why there are several cases pending against the major concert promoters, and that is why those cases are still pending in the District of New Jersey. The answer is, yes, it is illegal. And again, remember, we're the only state in the country with this protective statute. And probably the only state in the country that can boast that we'll never get an NFL Super Bowl again. And it took us 50 years to get the first one, so I don't think it's going to affect the trade of commerce of New Jersey. Because we have spent all and more than your time talking almost entirely about standing, but not entirely, I want to ask this question. I'll ask the same question of your adversary. Given the difficulties interpreting this statute, and especially given the public policy concerns that you yourself have spoken to very well here this morning, isn't this almost a quintessential question that ought to be certified to the New Jersey Supreme Court? It absolutely is. I asked you that the first time, I'll ask you that the second time. I did ask you that respectfully, and I ask you that again.  Look, from my shoes, quite frankly, if we were to be fortunate enough that you would find Article III standing based upon this depleting, to be remanded to a judge who's already on two occasions basically made rulings when he had no jurisdiction to do so would not be good. I would not want to entertain that argument. I mean, if we found standing and sent it back, I would be certainly comfortable. My question has nothing to do with the particular district judge who decided this case or to whom it would be returned. It goes more to the nature of the question involved in the public policy that animates this statute. I 1,000 percent agree with Your Honor. We did ask for that, and again, I strongly, strongly ask for that. We'll have you back on rebuttal then, Mr. Nagle. Thank you so much. Thank you very much. Mr. Pressman. Do you mind if I leave this, or shall I take it? You can leave it. Is it okay if I do that, sir?  May it please the Court. Your Honors, if it is true that this Court provided a road map for plaintiffs to follow on remand, they have surely fallen off course. Because, Your Honors, the only difference between the version of the complaint before the Court today and the version which this Court properly concluded warranted dismissal for lack of Article III standing based on the fact that appellant had failed to set forth allegations sufficient to plausibly demonstrate that he had an injury in fact, the only difference is the addition of allegations parroting the conclusory opinions of appellant's purported expert. But what this Court found, the loss theory proffered by the appellant the last time around, was not opinions. In fact, Judge Fuentes, you specifically acknowledged and credited Mr. Nagle's claim that he had an economist lined up to back up their claim. What this Court found was lacking was well-pleaded facts. Because the Second Amendment complaint fails to rectify this fatal deficiency in the slightest, the District Court's decision to dismiss the complaint for lack of standing should be affirmed. Didn't Mr. Nagle's expert essentially say that if he had made the tickets available and they had been sold to the public, the price for each ticket would have been driven down and Mr. Finkelman would have paid less for the ticket than he eventually paid, which I understand was about $2,000 some dollars for each ticket. Your Honor is correct. That's certainly what he opines, but he provides absolutely no facts to support that. In fact, Super Bowl XLVIII, the event at issue, is only mentioned twice in the entire expert report. This such detailed, never-before-seen expert report is not so detailed to actually address the only event in question, which is Super Bowl XLVIII. In fact, when you look at paragraph 19, which Mr. Nagle cited, all that says is that one particular broker on its website, if you read the footnote, the claim is from the website, says we have partnered with 14 of the NFL's teams. And then with respect to the alleged distribution of Super Bowl tickets to that particular broker, that's not based on fact. That's simply the expert, Mr. Rasher, taking 32% or 35% of the tickets and dividing it by 32 teams and doing some math. But Your Honor is right. That's what he posits, but he doesn't provide a single fact to support that opinion. At a motion to dismiss, particularly with the road map, let's call it, that this court provided, why isn't that enough? They haven't had discovery yet. Footnote 97 doesn't really talk about facts. It says this court didn't have to evaluate what would have happened if the expert opinion was in the complaint, which now it is. Why isn't that enough at this point? And all of that for purposes of plausibility. Correct. And Chief Judge Smith, plausibility is the important term. And Judge Stark, I want to get to your question. But what Mr. Nagle said on his initial argument was it just has to smell like it. It has to feel like it. That's not the standard. Chief Judge Smith, as you note, the standard is plausible. As Judge Fuentes wrote in your last opinion, the touchstone for pleading deficiencies is no longer possibility. And it's no longer consistency. It's plausibility. And the reason, Judge Stark, why it's not enough even at the pleading stage is that courts have never accepted conclusory allegations, even if they are couched under the cover of an expert opinion. Well, now, wait a minute. Are you suggesting, I mean, I will unabashedly say that in a pre-Quambly, pre-Iqbal world, we wouldn't be here listening to these arguments, which are made based upon the contents of an expert report and whether or not the foundations of that expert's opinions are speculative or are grounded in fact. I mean, it just wouldn't have been a question. It is now, and we are here. But I'm interested in looking at how this pleading stacks up in whatever a district judge is required to look at these days post-Quambly and Iqbal. And Chief Judge Smith and Judge Stark, I think your questions are aligned. But, I mean, the point is it has to be more than a possibility. And when this court looked at this case the last time, it cited an important decision from the D.C. Circuit, Dominguez. And Dominguez was at the pleading stage, Judge Stark. And in that case, the expert submitted a report that theorized about a secondary market for plane tickets. The complaint in that case was that because United had restricted the resale of plane tickets, the plaintiff was deprived of an opportunity to sell his tickets or purchase cheaper tickets on a secondary market. And, in fact, the plaintiff there proffered an expert report, a very qualified expert, that went through how a secondary market in that case would have led to cheaper prices. What the court, the D.C. Circuit, said was, that's not enough. Dominguez was a summary judgment decision. Is that wrong? Dominguez was a summary judgment decision. Isn't that a key distinction from where we are here? Well, the facts that were found in Dominguez were even better than the ones that are alleged here. Because there was a very detailed report. Their expert actually done a study of the precise theoretical market. But what this court found was, a theoretical market has intractable standing problems because, essentially, it relies on conjecture. But I would point out, the cases we have cited, Varela, the Fifth Circuit, had an expert report on a motion to dismiss. That was a RICO case. And in that case, the employer, it was alleged, had hired undocumented workers. And the plaintiff there claimed that the workers were paid below wages, lower wages than they should have been, because the employer had employed all of these undocumented immigrants. And they actually had an expert who put forth an expert report and said, I have done a study of this, and yes, in fact, the wages were lower. Immigrant workers would lead to lower wages. The court said that wasn't enough. Because it was pure conjecture. It was speculation. There were no facts to support the theory. It was an opinion. And an opinion cannot repair an absence of fact. That is exactly what this court found. In fact, Judge Fuentes, last year, this court issued a decision in which you, in part, dissented, in part, concurred. The case was the Customs Fraud Investigation case, you may remember. There, the plaintiff presented an expert opinion, an affidavit, very detailed, showing that the defendant in that case had failed to properly mark some steel pipe fittings so that it would be properly taxed. And their expert in that case went through a huge statistical analysis. And, in fact, it was a professor from the University of Pennsylvania Wharton School of Economics, on fair par with Berkeley, I would say, who went through an entire statistical analysis. And what you wrote, Judge Fuentes, is that you can't rely on opinion alone. There needs to be some factual basis for it. And you, in fact, cited the decision in Finkelman the last time around. And what you wrote was, even there, Finkelman theorized about the secondary market, but there were no facts to support it. And, Judge Stark, that is exactly what you got out with your question. There are no facts in this newfound expert report. Is it not factual that if the supply is constricted, which is the case of the tickets here, it's basic economic theory that the demand and the price is going to go down because there is more supply? Well, that's not always the case, Judge Fuentes. I think, in theory, less supply perhaps leads to greater demand. The facts here are that 80,000 tickets were not made available to the public. But if 80,000 tickets are, in fact, made available to the public, the supply is about as much as it can get. And, therefore, Mr. Finkelman would have paid less for his ticket. What's wrong with that? Well, I disagree with that. That's what I think the expert is saying, basically. That, frankly, is what he's saying, is, you know, lower supply leads to increased demand. And that's not always the case. But I understand where you're getting at, and I understand the theory. The problem is this is a very unique event. In fact, as you wrote yourself, Your Honor, the Super Bowl is perhaps the ultimate example of an event where the supply is exceeded by the demand. If the NFL were required, by virtue of a judicial decree, by virtue of a verdict, by virtue of a determination of a judge in this case, to scrap its current system to comply with the New Jersey Consumer Fraud Act provisions we're dealing with, the NFL would not be constrained by its previous pricing policy with respect to the 1% of the tickets, would it? The pricing policy and the 1% of tickets being going through the lottery? Yeah. I mean, I think the short answer to Your Honor's question is the NFL is going to follow the law. And if the law in New Jersey says they have to distribute some of that. Maybe I should have been more specific. Would the price remain the same? I don't think any of us in this courtroom, much less this country, know how much the value of the Super Bowl ticket is. It is so dependent on the demand for the teams, the location, how good the matchup is. In fact, that's one of the points we raised in our brief, Chief Judge Smith, which is there's no telling that even if the NFL had released all of its tickets to the Super Bowl for free, that Mr. Finkelman wouldn't have paid exactly as much as he did or more. In fact, he actually alleges that he paid less than his former co-planner, Mr. Hawk Parker, who paid more than double what Mr. Finkelman paid for his tickets at exactly the same time. If you go back in the record and you're free, the first amended complaint, Hawk Parker says that the cheapest tickets he could find on the open market at the time Mr. Finkelman purchased his tickets were $4,200 each. Are these issues that would be more appropriately and better fleshed out at a Daubert hearing rather than at a motion to dismiss? Respectfully, no, Chief Judge Smith, because in order to get to a Daubert hearing, you need to have a plausible claim to begin with. The mere assertion of a claim and the inclusion of an extra report doesn't serve as a one-way ticket to discovery. If it did, if we follow their argument to its logical conclusion, what we are saying is that as long as you submit an extra report, it doesn't matter how plausible your claim is, you're going to get to discovery and we'll deal with it later in a Daubert hearing. What this court has said previously, what Judge Fuentes wrote in the customs case, is that you don't necessarily get to Daubert with everything. Sometimes the allegations themselves do not present a plausible claim, and that is the case here. And when you hear Mr. Nagle say that all he has to do is submit a claim where it smells like or feels like scamming, he misses the Twombly standard. That's not the standard. In fact, in Dominguez, what the court said was consistency with a conspiracy, even vouched for by an expert, is not enough. It's got to be more than possible. It's got to be more than consistent. Here, at most, at most what they offer is a strong suspicion that tickets would have been cheaper had the NFL distributed its tickets in a different manner. But a strong suspicion, as the D.C. Circuit wrote in Dominguez, is not enough to confer Article III standing. And because Mr. Nagle has not demonstrated Article III standing, he therefore has no right to proceed at all. The court need not even get to the statutory interpretation. And I do want to address, I know Your Honor had asked whether or not I would respond to your question regarding certification. It's well settled that certification should be reserved for rare instances, and courts should be especially slow to certify cases where claimants such as Mr. Nagle And we are, and we have a track record of that. But it certainly reflects a concern for an interest in federalism and comedy. And this is a unique statute. And I refer not only to the legislation which added this ticketing provision, this ticket sales provision, to the NJCFA. But the CFA as a whole, as Mr. Nagle has pointed out, is extremely, a very pro-consumer statute that stands out nationally. And I know of no other state statute that is as pro-consumer as this one. That's a reflection of unique New Jersey public policy. And that to me suggests that there are underlying interests in this statute, which led to the passage of this statute, which maybe are better addressed by the state's highest court rather than us. So, I mean, that's what I'd like to hear you respond to. Well, Your Honor, I understand your point. And there may be cases where that, in fact, is true. Where the question of whether or not the New Jersey Consumer Fraud Act has been violated should be certified. This is not one of them. This is a limited event. It's a once-in-a-lifetime event, as Mr. Nagle pointed out. It's not an event that is to occur in New Jersey every year. And so this is not the type. Mr. Nagle has filed a number of other claims under the same statute. I will say all in federal court in New Jersey. And those are cases of the ordinary concert variety where the events are likely to occur all the time. But certification, Chief Judge Smith, is still not appropriate, even if we are to accept that this is a very significant and important issue, because the case in this matter does not turn on the statutory interpretation because of the absence of standing and because of the absence of the ---- You understood my question. My question simply assumed whether or not we got by standing and assuming a standing if we have to reach the statutory interpretation issue, who is best equipped and most suited in our federal system to our system of federalism to address such a question. I see my time is running out. I may have a few more minutes to briefly conclude. But I do want to finish up on this point, Chief Judge Smith. I agree if we're just on the statutory interpretation question, in some cases, which is the ones I mentioned where the concerts are routinely occurring in New Jersey, it may well be that that's better settled by the New Jersey Supreme Court. This is not one of them. And it's not just because it's not determinative based on the standing argument. It's also not determinative because there's an absence of causation and also, as we argue in our papers, an absence of ascertainable loss. Now, Judge Stark, I want to get to one of the questions that you asked my adversary. I have one more for you, too, but go ahead. Okay. Well, you asked, essentially, season tickets or college athletic tickets, would those be illegal under the statute as the appellant reads it? And Mr. Nagle answered they would. And that cannot be because if you read the New Jersey Consumer Fraud Act, Section 35.3, which is just two sections below the one we're arguing about here today, it specifically states and mandates that people who offer season tickets have a procedure by which people can return their season tickets or offer them for sale. So it would make no sense for the legislature to say we need a statute that outlaws season tickets. Okay. So he's got his parade of horribles, too, though, which is, and this is going to be my question to you, he says if your interpretation of the statute is right, then no one will ever violate it. It can't be violated because you read an intent into the statute and you can always just say, well, we never intended to sell any of these tickets, for instance, to the general public. Can you give me an example of how someone could violate the statute if your interpretation of it is correct? Absolutely, and I strongly disagree with their characterization. Our interpretation, our reading of the clear language of the statute would not alter its application at all. It would apply just as it's intended. In our case, there is no dispute by their allegations that the NFL has never released tickets for sale to the general public. But in most other concerts, performances, theaters, there will be some dispute about that, whether or not in the ordinary course of business tickets are routinely distributed to the public and whether in particular cases somebody- Why can't whoever the statute applies to, if your interpretation is right, why can't they just say the stadium has 80,000 seats. We never intended to sell more than, you know, 30,000 of them to the public. So we don't violate, even though they may well have given the, whatever, 50,000 to brokers. The reason Judge Stark is really based in the uniqueness of the Super Bowl, which is a one-time event for that particular year. In most cases, such as a theater or a concert, those events take place in various cities. They literally would be in Philadelphia tonight, New York tomorrow. And there will be ways to show that in one particular venue they had 85% of the tickets released. But, hey, when they went to New Jersey, Bon Jovi has friends in the audience, and now they only released 50%. So there may be- What their argument really raises is that in the great majority of cases, there will be perhaps factual disputes as to whether or not there was a violation, whether or not tickets that would ordinarily have been made available for public sale were actually withheld. And that's what the plain meaning and the words used by the statute require. It says it shall be an unlawful practice for a person who has access to tickets to an event prior to the tickets released for sale to the general public to withhold those tickets from sale to the general public in an amount exceeding 5% of all available seating for the event. The statute is written in a way that assumes what we're talking about are tickets that are ordinarily in the ordinary course to be made available to the general public. It doesn't apply to the college sporting event where 50% of the tickets go to alumni. It sounds like it's very easy to avoid the statute entirely. In other words, to avoid what the legislature was concerned about simply by holding back the tickets and distributing them to the secondary market one way or the other. Well, theoretically, Judge Flint, that sounds impossible. It sounds like a dead letter law. Respectfully, Your Honor, it is not because while in theory that may work, the economic reality is they couldn't afford to do so. That most concerts, most plays, most theaters are not going to be the draw of the Super Bowl, which is perhaps the world's most popular sporting event is. And in most cases, it would be economic suicide to say, well, we're just going to leave it to the secondary market. In this particular case, the assertion is that the tickets were distributed. In other words, they were not withheld. They were not withheld. And as the leading case in New Jersey. But let me understand this dynamic, however. When you say they are distributed, the NFL is a business. They're not really given out free. They're actually sold, aren't they? Well, they're given out. I mean, they're distributed and there's certainly money coming in. And then the secondary market exists by virtue of the distribution of those tickets going out to various. Frankly, the NFL has nothing to do with the secondary market. That wasn't my question. To the extent the secondary market exists, and I think we all concede it does exist, it exists largely in the form not of the 1% that had been purchased in a lottery, but by virtue of those tickets that had been distributed by the NFL to teams. The tickets originate from the NFL. There's no question about that. And if they make it onto the secondary market, they do so. But I would note that that itself is speculation because there's no guarantee there will be. Well, that's the position taken by the expert, though. Pardon? That's the position taken by the expert. I know the expert talks to the causation, but he cannot create an injury in fact based on pure opinion. And more so, for Article III standing, the injury in fact needs to be to a legally protected interest. Here, Mr. Finkelman's complaint offers no legal protection on the secondary market. The only legal protection he cites is Section 35.1. And by his own allegations, paragraph 32 of the Second Amendment complaint, he says, that statute wasn't enacted to regulate the secondary market. It was enacted to ensure that tickets are made available to the general public at face value. So because he cannot point to a legally protected interest, he fails the first bar to find an injury in fact. And that is not even getting to the fact that he can't demonstrate causation by failing to enter the NFL lottery. There is absolutely no authority offered by Mr. Finkelman that says that he is entitled to have the court reset the starting point for its analysis to follow a break in causal nexus, so that the court is simply to assume the break in causation never occurred. And Mr. Nagel, if I may just very briefly, she – Very briefly. We've given both of you, of course, more than you are allowed to. Mr. Nagel said that the court never opined on that, never said or took the position that the failure to enter the NFL lottery was fatal or broke the chain of causation. But in his petition for rehearing before this court, he said just that. On page 15, he said the court, quote, nonetheless reasoned that Finkelman's failure to enter the lottery was a relevant fact in determining the standing issue. This conclusion is simply wrong. And he asked the court to revise that conclusion. The court refused to do so. Is that the position taken by the expert that Mr. Nagel has proffered? The expert really doesn't opine on anything having to do with the Super Bowl distribution for the Super Bowl XLVIII. He doesn't really mention it. As I said, only in two paragraphs. So he doesn't opine on the lottery at all. That's part of the problem. There are no facts here. On the football field, we would call this a legal procedure. Before the district court, it was a basis for dismissal. And before this court, it's a basis to affirm that decision. Thank you. I thought you'd characterize it as an incomplete past, but that's fine. Mr. Nagel. I'm a bit at a loss because the expert absolutely draws conclusions with regard to Super Bowl XLVIII. And you've cited the exact paragraph where he draws those conclusions. And we've actually already see it. Page 28, page 23 of the complaint. Mr. Finkelman paid more on the secondary market for his tickets to Super Bowl XLVIII than he would have had the NFL not withheld more than 5% of the tickets from the sale to public. And the other point that counsel overlooked, and I want to flag to your honors, is we have redlined the amended complaint versus the first complaint. And you will see in this amended complaint, I'm happy to supply the redline if it's an aid to the court. You will see that we pled this time that the bulk of the tickets under contract with the prime brokers are funneled into the secondary market. And we've also pled that the NFL had full knowledge of this and encouraged this. So we've pled the facts that the large majority of the tickets are given to the teams. Those teams have contracts with the prime brokers, which I went through before. Prime scored an ace. You didn't see that in the first complaint. And that they're then substantially marked up when they're packaged with travel, entertainment, etc. So we have a series of new factual allegations which support the conclusion that but for the restrictive sales, but for the violation of this statute, the price would not have gone up. And the price did go up. And we say it, and we plead it throughout. Now Judge Smith, Chief Judge Smith, on one point, I just want to make a footnote on the point, and that is we have taken the position contrary to counsel, the NFL, on the issue of whether or not the Iqbal-Tawami standard applies to an Article III analysis. And we do, we've cited to your honors the fact that there's, within this very circuit, there's three cases, Charlton, Sukert, and Imre-Sharon Plow. Judge Chief Judge Smith, your honor, authored Sukert. And then there's three cases the other way, which says no, the plausibility injection should not be applied. Animal Science, Davis, and Wallach. And I believe Judge Fuentes, your honor, authored or joined in the Animal Science. So there is a split. It's our view that plausibility has no place in an Article III standing analysis. But even if it did, we still satisfy that. For injury and fact purposes, what's the legally protected interest, if we think you're wrong about the merits interpretation of the statute? The injury in fact is quite simple. This statute was passed to protect the public and restrict the price gouging in the secondary market. The injury in fact is that when anybody, Finkelman and other class members, enter the secondary market and paid substantially more than they should have paid, that's the injury in fact. But if the interpretation of the statute is what the NFL says on the merits, do you still have injury in fact and a legally protected interest, or is it all bound up? Are the standing and the merits questions the same question? No, I'm not sure how to answer that because I'm not sure how to interpret a statute as a nullity. The NFL suggests as follows. Even though every district court judge here that's addressed this issue, Judge Chesler, Judge Thompson, one other judge, even though every judge who's addressed this has said the statute was passed in order to stop the holdbacks for artists, for friends, for sponsors, and provide the public access again, it's a two-prong, good seats which they couldn't get and good prices, even though that statute was passed, the NFL says, by the way, we can nullify that by determining ourselves what we're going to release. No, that's the very reason the statute was passed. So I can't respond to an interpretation that interprets the statute as a nullity. And despite what he said, there would be no violation if the promoter of the tickets or of the concerts or of the event had the right to unilaterally decide what is to be released. It's simple. Ninety-five percent needs to be released. That's simple. It's a matter at this stage that you haven't really offered any way to calculate how the NFL's withholding of the tickets would affect the price that Pickleman would end up having to pay. And at the pleading stage with a couple of weeks' notice to an expert, that would have been next to impossible. This is something that needs to be fleshed out by way of more analysis, by way of discovery. It's enough, and the case law says it's enough to say there is an injury, and the case law which we briefed says we do not have to quantify it at the 12B6 or the Article 3 standing stage. We don't have to quantify it. We will quantify it as we go forward. But at this stage, the law does not require me to do so. Respectfully. Thank you very much. Thank you, Daniel. For your very helpful briefing and your helpful oral argument as well. We will take the case under advisement, and we'll ask the clerk to adjourn the proceedings. Please rise. Case Closed again. Adjourned. Thank you.